Based on the calendars, Romero v. St. Vincent's Services Good morning, your honors. May it please the court, Daniel Dugan for the appellant, Ms. Javiera Romero. Appellant seeks the reversal of the district court's granting a defendant's motion for summary judgment in this employment discrimination action. Ms. Romero had been employed by Hardshare St. Vincent's for over two years until her discriminatory termination on September 26, 2018, less than two weeks after undergoing fertility treatment and putting her employer on notice that she was pregnant. Getting right- Can I just ask, just to make sure I understand the scope of the arguments we're talking about today. Does all of your argument hinge on whether there's a fair inference that the employer was aware of the note that was dated September 11th? Does everything turn on that? There's a question of fact. Oh, I know there's a question of fact, and you argue that it's a material question of fact and all that, but does everything turn on the note is my point. If we were to rule against you on the note and to say that there was, in fact, no fair inference that could be drawn from that, is there some other basis, or does everything turn on that note? In addition to the note, the circumstances surrounding Ms. Romero providing the note to her employer add to- That she had told somebody that she was trying to get fertility treatments. It all turns around the note and its surrounding context, right? It turns on the note from Reproductive Medicine Associates that she underwent a treatment, yes. Got it, okay. Thank you. I just wanted to make sure I had the focus right. Yeah, so again, the defendants argue that there's no evidence that her employer knew that she was undergoing fertility treatments or was pregnant. Yet, in the week leading up to Ms. Romero providing her employer with the note again from Reproductive Medicine Associates that she was undergoing treatments, she had left voicemails for her direct supervisor and sent emails to him that she had been out sick, that she was still not feeling well. And then on September 17th, during their weekly supervision meeting, she provided him with a doctor's note. Her direct supervisor was aware that the employer had a policy that if an employee was out for more than three days, they had to provide a note. So her direct supervisor's testimony that he did not read the note is not dispositive of the issue of whether her employer knew or had reason to believe that she was pregnant. And there exists a factual dispute as to whether he read that note. Judge Matsumoto, in the pre-hearing conference, where she had the full record, the 56-1 statements, all the exhibits in front of her, exhibited that factual dispute when she said it would be unreasonable and an employer cannot just escape liability by saying, I didn't read that note. I ignored it. Also during that time, Mr. Alexander, Ms. Romero's direct supervisor, had been specifically instructed to look for documentation following a discussion on September 14th in which they discussed Ms. Romero's performance. So again, it's not plausible and it's an issue of fact for a reasonable juror that if he was looking for documentation, he would have read the note. I'm sorry, what is the issue of fact that you're claiming exists beyond whether or not he read the note as it relates to September 14th, meeting where the decision was made to terminate your client? Will you dispute that? The decision was not made on September 14th. And in defendant's 56-1 statement, and that's on page 547 of the record, there was a discussion regarding the employee's complaint regarding time off for- So when was the decision made, when your client was notified on the 26th or when the employer decided to terminate her on the 14th? That's an important distinction. So all that's in the record is that she was terminated on September 26th. The employer doesn't assert that they made the decision in that phone call on September 14th. If they did, or if there were documentation, it's not in the record. Simply a phone call was held. And we know that, am I correct, that the ultimate decision maker was Sophia? I don't know if I'm pronouncing that name right. And that call, which I think is September 14th- That's correct. The ultimate decision maker recommended termination, but you're saying that was only a recommendation and not, where am I getting the facts from? And again, it's not a recommendation. All that's asserted is there was a discussion on September 14th. There was no, there's no documentation of a decision to terminate. There's no testimony that on that date, it was decided that we are going to terminate Ms. Romero. On September 17th, she provided the note to her direct supervisor. And again, to clarify, Ms. Sophia, again, on that call, it was in conjunction with an HR representative, her direct supervisor, Mr. Alexander. And it was after Mr. Measles' complaint. So, and that was the impetus for that call, am I correct? That was the impetus. So, it's a call with Alexandra, Corporate Compliance, Human Resources, and the Executive Director. And there's a discussion of the response to that, the appropriate response to that complaint. There is a discussion, right. Excuse me. But there is, again, no record evidence that a decision was made on that day. Mr. Romero provided the note on September 17th. And then she was terminated on September 26th. And again, the staffing change form on that day, her termination notice, set forth that the reason was that she denied an employee a day off her religious observance. So, can I direct your attention to page 335 of the appendix, which I think is Ms. Sophia's testimony. And maybe you could clarify the date of the discussion that's being discussed on page 335. Because I think the testimony is that she says, I don't recall exactly what happened on the call. But I believe that I said, she goes on, I think we need to terminate. My recollection was that Michael Katrona and others all agreed that that was what was the appropriate course of action. I'm sorry, what page was that? I'm sorry, A335. 335, okay. Yeah, could you just clarify, because I guess I'd have to flip back and forth. I thought that was September 14th, but I could be wrong. There is only one call, yes. And that's September 14th? That is September 14th. So, how do you read that testimony to be other than, and they say, I think we need to terminate. And I understand she's the decision maker, right? I mean, is there a dispute that she's the ultimate decision maker? Yes. Okay. There is a dispute? Yes. Okay. But then it says, my recollection was that Michael Katrona and others all agreed that that was what the appropriate. That was, that that what was the appropriate course of action. It sounds, when I read that, to be an agreement. That they all agreed to terminate. How do you read that in a different way? Because then when you go to defendant's 56-1 statement, I believe it's page 547. They only assert that a discussion was held. And again, there's no documentation with that many individuals on that call. Ms. Romero returned to work. And then she was not terminated until September 26th. So you're saying that because the defendant's rule 56.1 statement on page 547 doesn't characterize the call in the way that I just described it, that the court can't have construed it that way? But I believe a reasonable juror could see that the note where she informed them that she'd undergone fertility treatments, was pregnant, came on September 17th. That the decision was made thereafter. And that note, her pregnancy, was a motivating factor. If there was, wrap it up. Assuming that the proper inference here is that the note was read. It doesn't exactly inform the employer that she was undergoing fertility treatments, does it? It says she's seeing the director of the fertility program, and she's having a procedure. But it doesn't specify what that procedure is, or that she's seeking to become pregnant. It's reasonable to infer that coming from reproductive medicine associates, and that she had undergone a procedure, that her employer inferred that she was pregnant. Thank you. Is the case law that just you're undergoing procedures to become pregnant, or does it have to be evidence of actual pregnancy? Well, there's no dispute that she was pregnant on September 13th. And the trial court accepted that? Yes. But in terms of the employer knowing, does it have to be the employer knowing pregnancy, or an intent to become pregnant in the future? Do you see the distinction? I do. Pregnancy, perceived pregnancy, or pregnancy-related medical condition. Which would encompass fertility treatments. Thank you. Good morning, Your Honors. May it please the Court. I am Stephanie Torin, representing the defendant appellee, St. Vincent's Services, Inc., otherwise known as Hartshare St. Vincent's. Or for purposes here, I will say Hartshare. Hartshare respectfully submits that Judge Matsumoto's June 2022 order granting Hartshare's motion for summary judgment be affirmed, and the appeal should be dismissed. As plaintiff has not established that Hartshare discriminated against her because of her pregnancy, or any perceived pregnancy in violation of Title VII of the Civil Rights Act of 1964, or the New York State or the New York City human rights laws when she terminated her employment after two years in September 2018. Judge Matsumoto correctly opined that plaintiff has not established her burden to set forth a prima facie case under the applicable McDonnell-Douglas standards. She focused on the last prong of the prima facie case, plaintiff's inability to show that her termination occurred under circumstances giving rise to an inference of discriminatory intent. And your honors already focused in on essentially what the two issues that Judge Matsumoto addressed. Plaintiff's failures concern lack of notice and timing. Plaintiff has not pointed to any miscible evidence from which a rational jury could infer that Hartshare knew that she was pregnant or undergoing fertility treatments and thus perceived her to be pregnant. As counsel has admitted, plaintiff's sole claimed evidence that Hartshare had notice of her pregnancy and any fertility treatments and thus perceived her to be pregnant, is this September 11th, 2018 note that she purportedly provided to her supervisor on September 17th. This was purportedly during a meeting where they were discussing something else. It was put into an envelope among a stack of other papers and she never communicated to her supervisor that there was a doctor's note within there. That being said, she also admits that she never communicated with Hartshare verbally or at any other communication other than this note that she was pregnant or undergoing fertility treatments. Fatal to plaintiff's discrimination claims is that absolutely nowhere within this note does plaintiff's medical provider indicate that she was pregnant. There is nothing that says that she is pregnant, nothing that says that she is trying to become pregnant. There is also nothing in the note that indicates that she is undergoing fertility treatments or anything similar. All it has is a note saying that it's from Reproductive Medicine Associates of New York and that she was undergoing a quote unquote procedure. It does not identify the nature of that procedure as Judge Matsumoto correctly opined and as a result, does not raise an issue of fact as to whether Hartshare could have perceived her to be pregnant. But does it have to be that she was perceived to be pregnant? Or could it also be that they perceived her to be undergoing fertility treatments such that she could become pregnant? Well, the claims here are that we discriminated against her because she was pregnant itself, which the note itself does not indicate pregnancy whatsoever. No, I understand that. But then the other claim that they've raised, they haven't raised anything about disability discrimination or anything along those lines. They're claiming that it's a perceived pregnancy. So as a result, we had to be on notice that she was undergoing fertility treatments or, I think Your Honor raised, observed to be pregnant or something along those lines where our client would have somehow perceived her to be pregnant. Those are the two claims that are being raised by plaintiff. Because hypothetically, let's say there was proof. Let's say there was a deposition by the supervisor saying, yeah, no, I read the note. I read the note. You would agree that you could draw a plausible inference, drawing inferences most favorable to the plaintiff here, that someone who did read the note could say, well, look, it's letterhead. It's from reproductive medicine. It's not just a general OB-GYN practice. And they're saying she's having a procedure that one could infer that there's a fair likelihood it's some kind of infertility treatment. I mean, would you agree that that would be a fair inference? Again, assuming- Yeah. Contrary to the record here that there was evidence that it had been read. I respectfully disagree, Your Honor. I don't think that without identifying what the nature of that procedure is, because the name of a practice does not necessarily indicate that is all that they could do. Could they be going to reproductive medicine associates to have fibroid removals? Could they be terminating a pregnancy? And so here, plaintiff is basing this claim solely on speculation. There is the name of the clinic and an unidentified procedure, which is what Judge Matsumoto- And the director who is her doctor is the director of the fertility program. Yes, Your Honor. But even if, hypothetically, Harcher was on notice, one, from the content of the note, and two, that Mr. Alexander actually read or received and read this note, we still have the main issue of timing, which Judge Matsumoto also correctly opined upon. We have the situation where- And that's a distinct question about what the note said or didn't say. I'm sorry, Your Honor, what? That's a distinct question from what the note did or didn't say, who read it, who didn't. I guess I take it your argument is if they already made this decision, it was clear before the note was even produced to them, then that severs any inference whatsoever. Yes, Your Honor. And we've touched upon some of the timing, and Your Honors have correctly concluded that Executive Director Safeya did testify  There was some additional testimony, and this, I think, is what Plaintiff is alluding to, is that they were, as is common, going through HR, making sure they were finalizing the things, the internal operations of what they need to do for termination. Plaintiff was then absent for a week, being on vacation. But one other point that Plaintiff raised is we've got that she was out sick. Some of these e-mails, all they say is, I'm out sick, or I'm not feeling well. I don't see how putting those e-mails in conjunction with the note could lead a rational jury to conclude that one was pregnant because she was sick, because she was pregnant. I just don't see the connection or how a jury could conclude that. And similar, that she was undergoing fertility treatments. Judge Maso, note. You started to respond to their claim that there was no decision made to terminate her on the 14th. So is your position that the decision was made and then what occurred thereafter were just the mechanism of effectuating that termination? Or was there still a decision to be made? No. Dawn Safeya was the Executive Director. It's in an affidavit. She was the decision maker. She made the recommendation. She testified to that at her deposition that she made the recommendations and the others agreed. So for all intents and purposes, that decision was made on September 14th before Plaintiff claimed she gave Mr. Alexander the note. But putting, even if we fast forward, even if Plaintiff could establish a prima facie case, I think the papers show that we clearly could establish our low burden of establishing a legitimate nondiscriminatory business reason. We're focusing on some of the arguments that it's Plaintiff's burden to prove pretext. That the real reason was because of her pregnancy or because of her fertility treatments and as such we perceived her to be pregnant. But the trial court didn't base its decision on pretext. The trial court ended with a prima facie. Correct. Didn't go on to say even if there was a prima facie case. Yes. Should we go there if the district court didn't? I would respectfully submit that you should not. But I think she has established her burden of her prima facie case. But in the event your honors disagree, I do think that there's other reasons why she still cannot establish her burden to prove pregnancy and perceive pregnancy discrimination. Of note, the pregnancy related medical condition claim is not at issue on appeal. That was also dismissed by Judge Matsumoto. Excuse me. I think your adversary says if we were to go past the prima facie case and look at pretext that you point to the complaints about her managerial style and then the precipitating fact of Mr. Measles' complaint about not being given time to observe his religious observance time off. Your adversary says she had a good performance evaluation in 2017, a raise and a bonus, and most of the other complaints were further back in time so that he can satisfy establishing that it was pretextual. Do you want to address that just very briefly? Sure. Sure, your honor. One, she's an at-will employee as long as it's not discriminatory or retaliatory. One instance of an employee complaint certainly can warrant termination, but here we have a history of employees complaining. Although plaintiff, for some reason in the reply, says that she was not notified of any of these complaints, she actually testified that she was aware of at least five complaints, either from supervisors or from the employees who were complaining about her. The complaints were referenced in an August 2017 performance evaluation where it was recommended that she undergo managerial and communication-style training due to these complaints. So she was aware of it, and the decision ultimately, what we have here is the decision-maker, Dawn Safeya, was not aware at all of the note, and that is undisputed. She was the ultimate decision-maker. She was the one who said, I recommend termination, and the others agreed. So if she was not aware of it, there could be no bias here. And she had independent knowledge of the performance issues. Thank you, Your Honors. We'll hear rebuttal. Thank you, Your Honors. Going right to the stated reason for the termination, it was, you know, there's evidence that that reason was pretextual. At the time of her termination, which was September 26th, the notice stated the employee would not approve a staff request for taking time off for religious observances. Now, over the course of litigation, that reasoning has changed. Ms. Safeya has now testified that she admits that Ms. Romero didn't deny the request. The individual got the time off for the religious observance, and she testified that it was actually the hostile tone in the email that led to this termination. Yet, just one month prior, if Ms. Romero had this history of complaints and she was on the, you know, verge of one more complaint and she was going to be terminated, she gave her a raise and a bonus. Ms. Safeya was also her direct supervisor for months leading up to this decision. She never once counseled Ms. Romero regarding her management style, her communication. Yet, Ms. Safeya testified that Ms. Romero's previous supervisor, she did do those exact things with her. She had a progressive discipline policy that she followed with this other employee who had communication issues with other employees. That employee was not terminated on the spot based on one employee complaint. She counseled her. She provided her with management style training. She did not do that in this instance. And that leads to a reasonable juror saying the reason for the termination was pretextual. Ms. Safeya admits there were no prior warnings. Generally, her progressive discipline style was that she would normally give them chances. Counsel employees. Then write them up to HR. None of those things happened here with Ms. Romero. In addition, Ms. Safeya testified that she was not qualified at that time to do a performance review of Ms. Romero. Yet, management style communication with employees was one of the key factors in those annual performance reviews. Yet, she testified at that time, even though she was the direct supervisor for months leading up, she couldn't make that determination. She didn't feel qualified to do so. Yet again, she made the determination to terminate Ms. Romero, which leads to a reasonable juror concluding that those reasons are pretextual. Lastly, I just want to note that under the New York City Human Rights Law, which is uniquely broad and liberal, under those standards, the court should find that Ms. Romero was terminated based on her practice. Thank you, Your Honors. Thank you both, and we'll take the matter under advisement.